## Charles H. Palmer v. William W. Williams and others.

*Agreement: Trustee: Purchaser with notice.* An agreement whereby property owned in common is put in the name of one of the owners, to be held by him as a trustee for the benefit of all parties, "subject to such decisions as the parties may direct from time to time," gives him no right to sell the whole without the consent of all the owners; and a sale to a purchaser with notice can convey no more than his personal interest.

*Authority to trustee to sell: Sale not in compliance with instructions.* Where authority is given to the trustee, in such case, to make a sale on specified

terms, he cannot make it except in compliance with his instructions, and cannot give credit where he is told to sell for cash.

*Consent to sell at one time at specified price, not a continuing one.* Neither does consent to sell at a given rate, at one time, when the sale falls through, operate as a continuing power to make sale at a future time, especially where the property is mining land, and fluctuating in value; and new authority is required, after any considerable interval, even though the price obtained may be larger than that before provided for.

*Unauthorized sale: Ratification: Estoppel.* An unauthorized sale of land cannot be ratified except in writing, or by such conduct as creates an estoppel; and such ratification must be made by a party informed of the facts. And there can be no estoppel unless a party is misled to his prejudice, by the one against whom it is set up, and does material acts, relying upon conduct well calculated to mislead him.

*Bona fide purchaser.* No one is protected as a *bona fide* purchaser, who has not made payment before notice. It is not enough that he purchases without notice, if he pays after notice.

*Heard January 9 and 10. Decided April 3.*

Appeal in Chancery from Houghton Circuit.

This bill was filed by Charles H. Palmer against William W. Williams, Raphael Pumpelly, Thomas B. Brooks and John L. Spurr. The defendants answered, and proofs were taken. The decree was for complainant, and the defendants Pumpelly, Brooks and Spurr appealed to this court.

*Hubbell & Chadbourne, Sutherland & Wheeler, Douglass & Miller, S. F. Seager* and *Ashley Pond,* for complainant.

*Wilkinson & Smith, Moore & Griffin* and *George V. N. Lothrop,* for defendants.

CAMPBELL, J.

Complainant files his bill to enforce his rights as *cestui que trust* in certain lands in Houghton county, which were entered in the name of Williams, who continued to retain the title until in February, 1869, he sold and conveyed to the other defendants the entire estate, although Palmer was entitled to one-third. Complainant claims that this sale was made with notice of his interest, and that he should

be protected against it. The defendants, besides relying on want of notice, claim that Williams had a right to convey, and that Palmer has become estopped from disputing the sale.

The agreement under which Palmer claims, after reciting Palmer's rights to one-third, continues as follows: "And, whereas, the certificates for said lands are in the name of the said W. W. Williams, it is understood and hereby agreed between the parties, that so long as the property remains in the name of the said W. W. Williams, the same shall be held by the said Williams as trustee, for the benefit of all the parties in interest, and subject to such decisions as the parties may direct from time to time."

The history of the negotiation shows the following facts: In October, 1868, Spurr wrote to Williams from Lake Superior (Williams being in Manlius, New York), inquiring about this land, speaking of it as timber land and saying he desired to purchase it to enable him to carry out a wood contract, and proposing to make payments in accordance with the payments coming in under that contract. The evidence tends to show that Spurr and his associates had ascertained that valuable iron deposits were on the land, and that the wood contract was a subterfuge,—no such contract existing, and the lands having no special value for timber. Williams replied October 10, offering to take ten thousand dollars for it, and intimating that there was a good show of iron on it. Spurr wrote again on the 22d of October, conveying the idea that the suggestion about iron was new to him, and that upon receiving it he had gone out to examine the property with an agent of other parties, who proposed, if it was good iron land, to join with him in the purchase, and let him have the timber; but that the snow prevented any satisfactory examination, and that his friends would not invest at such a price with-

out further exploration, which could not be made till spring; but that they had decided to offer six thousand dollars, which he regarded as a large price and upon great risks. Williams, on the 29th of October, offered to split the difference and take eight thousand dollars. This offer was at once accepted, both by telegraph and by letter, in Spurr's name by Brooks and Pumpelly, with the statement that Pumpelly would soon go East, and complete the bargain. On the 10th of December, a written contract was made in Pumpelly's name to be carried out in sixty days. On the 8th of February, 1869, the deed was delivered conveying the land to all three, for eight thousand dollars, half down and the balance in one and two years, secured by notes and mortgage.

During the personal negotiations with Pumpelly in December the evidence shows that Williams informed him of Palmer's interest, and that he had a letter written within a year which he claimed gave him authority to sell. Pumpelly did not apply to examine it, nor did he make any inquiry of Palmer; and no intimation was given to him until April.

Our statute of frauds declares void every contract for the sale of any interest in lands not made in writing by the party by whom the sale is made, or by an agent by him lawfully authorized in writing. The first question to be settled is whether Williams had any such written authority.

There was no power of sale reserved in the original contract or declaration of trust. That expressly declared that the land was to be held "*subject to such decisions as the parties may direct from time to time.*" This contemplated that this power of direction should be continuous, and exercised whenever occasion might require; and it precluded any right of disposal without consultation with Palmer. If the authority existed it must have been elsewhere. And it is claimed to have been contained in letters

written in the winter of 1867-8. On December 6, 1867, Williams wrote to Palmer from New York that he had just seen C. C. Douglass, who wanted to know what they would take for this land, and that he had offered it at six thousand dollars if Palmer should be willing, and that Douglass wanted him to write to Palmer about it. To this Palmer replied as follows:

"I have your letter of the 27th. The land at Lake Michgammi consists of one hundred and sixty acres. At six thousand dollars it would be about forty dollars per acre. I would sell at six thousand dollars. What does Douglass want of it? Does he want it to go with some of his own lands? My opinion now is to sell, most decidedly. Sell for cash, and send me a certificate of deposit for my half forthwith;" and in a postscript he continues: "I wish you would write me at once about the sale of these one hundred and sixty acres of iron land. Knowing what Douglass wants of it, you can tell well enough what is the most he will give for it, and that price I would take. It is generally better to do well than to wait upon the uncertainties of doing better." In March, 1868, Palmer inquired in a letter to Williams about this sale, of which he had no further advices. It seems to have fallen through. The only further reference to it is in one of Williams' letters to Spurr, in which he speaks of the fact that the land was worth six thousand dollars in the previous winter, as showing that eight thousand dollars was then too low a valuation.

This correspondence does not amount to a continuing power to sell. It refers to a particular sale, and authorizes it to be made for cash, and rests somewhat on the idea that the purchaser named would be likely to give all the land would bring. But the terms of the trust evidently contemplated that the value was likely to fluctuate, and

that directions would be given from time to time. While the correspondence shows an entire willingness to make a cash sale for six thousand dollars at that time, there is nothing to indicate a desire to leave an unlimited future discretion to Williams to sell without further consultation; and the condition of a cash sale was explicit.

It is also to be remarked that the purchasers did not see these letters or rely upon them. They were in no way misled in the matter. And as the purchase is shown to have been made at about one-fourth of the lowest estimate then put upon the property by Mr. Spurr, it is quite plain that the risk of Palmer's interest would not have materially interfered with it at the price agreed upon with Williams. The contract made with Pumpelly was apparently made upon the assumption that Williams had a right to convey, and without any discussion upon that point beyond the mention of his interest and of Williams' authority as derived from him.

The nature and extent of the notice at this time need not be a very material element in the case, because at the time of the filing of the bill in this cause, one-half of the purchase money was unpaid; and as Palmer's interest was only one-third, the defendants could not be regarded as *bona fide* purchasers without notice of his portion, even had there been no previous knowledge of it. The rule uniformly settled in this state is, that payment must be made before notice in order to secure the title to the land purchased.—*Blanchard v. Tyler 12, Mich. R., 339 ; Thomas v. Stone, Walk. Ch. R., 117 ; Dixon v. Hill, 5 Mich. R., 404 ; Warner v. Whittaker, 6 Mich. R., 133 ; Stone v. Welling, 14 Mich. R., 514.*

The purchase from Williams was not, either at the date of the contract, when nothing was paid, or at the date of the deed when half the consideration was paid,

entitled to any protection as against Palmer. It cannot be maintained unless there has been some ratification of the unauthorized act of Williams.

This ratification, if not made in writing, with due knowledge of the circumstances, could only be made out by such conduct on Palmer's part as would equitably estop him from insisting on his rights. And such an estoppel would not be made out unless defendants had been so far misled by him to their own prejudice, that justice demanded their protection against him.

There is no such case made out. In the absence of any conduct designed or calculated to mislead, mere delay will not deprive an owner of his estate legal or equitable, until barred by some clear rule of equity. It is not like a case where a party has been defrauded into doing an act himself, which he seeks to have rescinded, and where continued silence, after the discovery of the fraud, may become a bar without reference to any fixed period. Here there has been an unauthorized assumption of agency, where the parties dealing with the supposed agent are bound to show his authority, or a ratification of it in some form.

The trustee, Mr. Williams, never reported to Palmer until April, 1869, when he sent from Detroit a statement of the sale, and, instead of one-third of the eight thousand dollars in cash, a note for two thousand dollars, and five hundred and eighty-four dollars and eighty-two cents in money. Palmer at once went in to Detroit, as he says, to object to the sale, but Williams had left. During the summer he had more or less intercourse and correspondence with some of the defendants, and recognized them as having the title to the land, and made overtures towards purchasing an interest from them. He testifies, however, and upon this there is no dispute, that he had no knowledge or information as to the real state of the case, or that they

had received any intimation of his rights. They did not apply to him for any ratification of the contract, neither did they take any action upon the faith of any supposed ratification. Up to the time of filing the bill, there had been no substantial change in the position of the parties, and their equities remained as they had been in the beginning. Of the manner in which they induced the sale, and the representations in contradiction of their actual knowledge of the great value of the property when they purchased, Palmer had no knowledge whatever.

There is then no foundation for an estoppel. This being so, and there having been neither original nor ratified agency, Palmer has never lost his title. The decree below enforcing it was correct, and should be affirmed, with costs.

The other Justices concurred.