92 469
103 244
92 469
107 321
92 469
123 183

JAMES A. CULBERTSON v. THE H. WITBECK COMPANY ET AL.

*Recording laws—Bona fide purchaser—Quitclaim deed.*

This case involves the question of the relative rights of the defendant corporation, a *bona fide* purchaser of a tract of land conveyed to it by warranty deed, and whose grantors derived their title through a quitclaim deed from the widow and sole executrix and legatee of the owner of the land, and of the complainant, claiming . under an unrecorded conveyance executed by such owner in his life-time, and of which the purchasers from the widow had no actual notice at the time of their purchase and of the conveyance of the land to them. Questions of fact are largely involved, and an examination of the opinions is essential to an understanding of the case.

Appeal from Marquette. (Stone, J.) Argued January 20 and 21, 1892, and reargued June 8, 1892. Decided July 28, 1892.

Bill to quiet title and for an accounting. Complainant appeals. Decree affirmed. The facts are stated in the opinion.

*Ball & Hanscom,* for complainant.

*Cahill & Ostrander ( B. J. Brown,* of counsel), for defendants.

MORSE, C. J. One Edward C. Wilder, in his life-time, acquired a one-eighth interest in about 14,000 acres of land in the Upper Peninsula of this State. The first conveyance to him was by William A. Pratt, who owned an undivided equitable quarter interest in this tract of land, the legal title being in Wright and Manning. This conveyance or assignment was dated January 8, 1857, and the lands conveyed were described as "one thousand

acres, undivided," of the whole tract. January 30, 1857, Pratt conveyed the balance of the one-eighth interest to Wilder, it being described as an interest equal to "seven hundred and fifty-eight 32-100 acres, undivided," of the whole tract. The 1,000 acres were on the same day of or soon after their conveyance to Wilder sold and assigned to one Patrick Tregent, of Detroit, Mich.   Afterwards, and on the 6th day of July, 1860, Manning and Wright, who then still held the legal title, with the consent of all of the equitable owners of the tract, made a partition and separation of the land, and made deeds conveying by specific description the portion and share of each owner to him.   Wilder received 1,748.20 acres as his share. The deed to Wilder was not put on record until about the time of the beginning of this controversy.   April 3, 1865, Wilder sold and assigned the 758-.33 acres, "undivided," by an instrument in writing signed by him, but not witnessed or acknowleged, to one Simeon E. Church, of New York city.   The land was assigned to Church in part payment of "oil lands" in Pennsylvania.   This assignment remained in Church's safe in his office in New York until July 14, 1884, when the father of complainant purchased Church's interest, and had it conveyed by quitclaim deed to his son, the complainant in this case. Wilder died in October, 1880, leaving a widow, Sophia A. Wilder, who was his sole executrix and legatee.

   In 1881, Nelson B. Jones, of the firm of Jones & Porter, at Lansing, Mich., through an abstract of title of the 14,000-acre tract, discovered that Wilder had an interest in these lands to the amount of this 758.33 acres, which apparently had never been conveyed.   Jones began looking up the matter, as he had some other interests in this whole tract in his hands for sale.   He found Mrs. Wilder, and obtained from her an agreement that the firm of Jones & Porter might " compromise or

sell any lands owned or belonging, in whole or in part, to the estate of Edward C. Wilder;" said Jones & Porter to be at all the cost and expense of such sale, and to have one-half of the proceeds of the same. April 11, 1881, J. Henry Moores, of Lansing, Mich., procured through said Jones & Porter an instrument in writing from Mrs. Wilder, as executrix of the husband's estate, assigning to him all the right, title, and interest of her husband in these lands. Afterwards he further procured .from her, as executrix, a quitclaim deed of such right, title, and interest, and also later on received from her individually a quitclaim deed of the land described specifically in the partition to Wilder. He had before this acquired the Tregent interest, so that he then had the apparent title to the 1,748.20 acres of land deeded by Manning and Wright to Wilder. It is not disputed but that he had both the legal and equitable title to the Tregent portion of this 1,748.20 acres, but the bill sets. forth that he had no title by this conveyance from Mrs. Wilder to that portion of the land remaining, and known as the "Church Interest." January 27, 1882, Moores, by quitclaim deed, conveyed an undivided half of the 1,748.20 acres to Jones & Porter for the expressed consideration of $5,000. On the same day Moores, Jones, and Porter conveyed the premises to the defendant the H. Witbeck Company for the sum of $38,000, upon which there remained unpaid at the time of the filing of. this bill the sum of $13,000.

The bill charges that Moores, at the time of the con-- veyance to him by Mrs. Wilder, knew that her husband had sold all his interest in these lands, and that she had no beneficial interest therein; that he induced her to give him the deed for a mere nominal consideration, when he knew the lands were worth more than $20,000; and that he was chargeable with notice that Mrs. Wilder

had no beneficial interest in the lands. It also alleges that Jones & Porter were interested with Moores in the purchase of this land, and were chargeable with the same notice as Moores. The bill further charges that the H. Witbeck Company was, at the time it purchased the lands, chargeable with notice that the legal title held by Moores and Jones & Porter was held to a large extent in trust for said Church.

The bill prays that complainant may be decreed to have a beneficial interest in said lands equal to 758.33 acres thereof, and that the same be partitioned and conveyed to him in fee, and that he may have an accounting with the said H. Witbeck Company for the timber cut by said company on the premises, and for general relief. Complainant also prays that, if said company shall be found to be a *bona fide* purchaser of said lands, he may pay to such company the sums of money that it may be entitled to have refunded to it, after deducting his portion of the value of the pine timber taken by said company from the premises, and have the land conveyed to him.

The defendants answered, each denying any knowledge or notice whatever of this assignment to Church.

The court below dismissed complainant's bill, and he appeals to this Court.

Mrs. Wilder and her sister, who was present when Jones called to obtain the title to these lands, both testified that Mrs. Wilder told him that she supposed that she had no interest in the land, and that one reason why she so supposed was, "so many years had passed, and I heard no more about it; and I supposed that Mr. Wilder was in poor health, and needed money, if he still owned the land, he would have sold it." It is claimed that this was sufficient notice to Jones to put him upon inquiry; that he did not make diligent inquiry,

and therefore, if he had purchased the interest of Wilder himself, he would not have been in the law a *bona fide* purchaser; and it is contended that Jones was the agent of Moores in this purchase, and that there was an agreement or understanding between them, before Jones visited Mrs. Wilder, that the title should be purchased in Moores' name, and that Jones & Porter should share with him in the profits of the transaction.

I agree with the circuit judge that the evidence does not clearly establish that Jones or Moores had notice that Wilder had parted with his interest in his life-time. The burden of proof is upon the complainant to show this. Mr. Jones denies that Mrs. Wilder told him what she says she did, but swears that she said that she knew her husband owned Michigan lands, but as to whether he had parted with them she did not know. Mrs. Wilder and her sister are both mistaken about the instrument Mrs. Wilder executed when Jones was at her house. Mrs. Wilder says that it was an assignment, and that she did not make any agreement with them to sell the land on shares, because she did not suppose that she owned the land. Her sister testifies that she thought it was a quitclaim deed that Mrs. Wilder signed, as that was what Jones called it, and that nothing was said about Jones taking the agency to sell the lands. The instrument executed by Mrs. Wilder, and the correspondence between her and Jones, show clearly enough that she must have understood, at the time, that she made an agreement with Jones & Porter to sell the land for her, and that they were to have one-half of the proceeds of sale. I am therefore inclined to believe that Jones tells the truth about the transaction at Mrs. Wilder's house, and that the only notice that he had of the matter was that Mrs. Wilder did not know whether her husband had previously sold his interest in these lands

or not. It is not clear from this record what further inquiry Jones could have made to ascertain whether this interest was in Mrs. Wilder or some one else. He had seen the son of Pratt, Pratt at that time being dead. He also went to the persons who knew of the partition papers, and procured copies of them, and finally found the partition deed to Wilder. How he might have ascertained the existence of this assignment to Church, which was unrecorded, and had been lying so long in Church's safe that Church himself can remember but little of the transaction by which he acquired it, is not clearly perceivable.

There is one circumstance which satisfies me that Jones, at the time he saw Mrs. Wilder and made this arrangement with her, believed that she was the owner of this interest of 758.33 acres. If he had thought otherwise, and supposed that there was in existence somewhere an unrecorded conveyance of this interest, he would naturally have taken at once a quitclaim deed from Mrs. Wilder, and hastened to put it on record. And I do not think that the notice he had, to wit, that Mrs. Wilder did not know whether or not her husband had sold it, was sufficient in law to prevent his becoming a good-faith purchaser of such interest.

It is evident that these lands were considered of little value by both Church and Wilder. No taxes seem to have been paid by either of them, nor any steps taken to take dominion of them. William C. Culbertson, the father of the complainant, had a number of tax titles on these lands, and had himself paid the taxes upon them from 1870 to 1880, inclusive. Moores knew that these tax titles were outstanding, as did Jones, at the time the agreement was obtained from Mrs. Wilder. After the conveyance to the H. Witbeck Company, Moores, Jones, and Porter, having agreed to clear the lands of said tax titles,

commenced suit in the name of .said company in eject-
ment in the United States circuit court for the northern
division of the western district of Michigan against said
William C. Culbertson, which suit was tried twice in such
court, and finally went to the United States Supreme
Court, where the tax titles were held to be invalid in
April, 1888. 127 U. S. 336 (8 Sup. Ct. Rep. 1136).
While this suit was thus pending, William C. Culbertson
purchased the Church interest, and had it conveyed to
the complainant. It was not shown how he obtained
knowledge of the assignment by Wilder to Church. Under
the circumstances, knowing that neither Wilder nor any
other person had paid taxes upon these lands, or asserted
dominion over them, except William C. Culbertson, who
was paying taxes in aid of his previously acquired tax
titles, it is not strange that Jones should think that
Wilder's interest was in his legatee, his widow. Nor is
it strange that he attached no importance to the fact
that Mrs. Wilder did not know whether or not the lands
had been sold; indeed, the fact that she did not know
would be apt to strengthen in his mind the idea that
Wilder had not conveyed his interest, as, if he had, the
inference would naturally have been that she would have
had some recollection of it.

It is claimed that the inadequacy of the consideration
paid to Mrs. Wilder is of itself strong proof that Jones
and Moores had notice that she had no beneficial interest
in the lands. But it must be remembered that Jones
and Moores knew that they were buying a lawsuit, the
outcome of which is never absolutely certain; and, under
any circumstances, they would be likely to get the land
of her as cheaply as possible. While the inadequacy of
the price paid to the value of the land has some bearing,
in cases of this kind, upon the good faith of the pur-
chaser, it cannot in this case be of any particular weight

in determining what the knowledge of Jones and Moores was as to a previous sale of these lands by Wilder. There is absolutely no showing of bad faith on the part of the H. Witbeck Company in making this purchase of Moores, Jones, and Porter.

Complainant further claims that Moores, by his conveyance from Mrs. Wilder, took only what right, title, and interest Wilder had in the premises at the time of his death, which was nothing. The first conveyance was made April 11, 1881, and was an instrument executed by Mrs. Wilder, in which she assigned—

"All the right, title, and interest of Edward C. Wilder, deceased, in and to a tract of land in the county of Marquette, State of Michigan, acquired by virtue of an assignment of an interest in said lands made by William A. Pratt, January 30, 1857, and recorded in Liber one, of M. R., page 95, in Marquette county, Michigan."

This assignment was made by her as executrix of her husband's estate. The second conveyance was a quitclaim deed as executrix of said estate, dated May 17, 1881, in which she quitclaimed "all her right, title, and interest" in certain pieces of land, specifically describing them; and afterwards, December 8, 1881, she conveyed by quitclaim deed the same lands named in the second conveyance, not limiting the deed to her "right, title, and interest," or that of her husband, but conveying the lands absolutely and without qualification. It is contended that Moores could not claim to be a *bona fide* purchaser under a quitclaim deed conveying only the right, title, and interest of Wilder, when at the time of such conveyance it was established that Wilder had no interest that his executrix could convey. We are cited in support of this contention to *Eaton v. Trowbridge,* 38 Mich. 460, and *De Veaux v. Fosbender,* 57 Id. 579.

In *Eaton v. Trowbridge, supra,* the deed conveyed the

"now remaining interest" of Hastings in the Mullett farm. It is said by this Court in that case that—

"Where a deed describes land by metes and bounds or otherwise, and purports to convey it, the grantee, if a purchaser for value without actual or constructive notice of previous conveyances, is entitled to claim what is described; but when one receives a conveyance of a 'remaining' interest, the description itself limits the operative words to the interest remaining unconveyed. The grantee purchases nothing further, and the grantor assumes to convey nothing more. The deed, under the recording laws, defeats no prior unrecorded conveyance, because it is not a second conveyance of anything previously conveyed. Both deeds may and do well stand together."

It was further held substantially, by the whole Court, although its members were equally divided upon other questions, in *De Veaux v. Fosbender, supra,* that the decision in *Eaton v. Trowbridge* applied to a quitclaim deed which purported to convey all the right, title, and interest of the grantor.

The deeds of Moores and of Jones & Porter to the H. Witbeck Company were warranty deeds, which the company took without notice of any claim against the lands by Church or any other person. Whether or not Moores and Jones & Porter are good-faith purchasers, the H. Witbeck Company must certainly be regarded as such.

This company bought other lands, to wit, the Tregent interest of 1,000 acres, of Moores and Jones & Porter, with the land now in controversy. It is not clearly shown what proportion the value of the lands in issue here bears to the value of the whole tract purchased by the H. Witbeck Company; $38,000 was the full purchase price, and $13,000 was not paid at the time this bill was filed. By this bill it was not sought to reach this $13,000 directly. The complainant insisted upon the land, and asked for a decree, if such company was found to be a

good-faith purchaser, and conveyance of the land to him, with an offer on his part to refund purchase money, less amount of timber cut, to the company.   No injunction was obtained to prevent the payment of this money to Moores and Jones & Porter, or to prevent the latter parties from selling or assigning the note and mortgage, —the evidence of such debt of $13,000.   There is no testimony showing that this sum has been paid by the H. Witbeck Company since the commencement of this suit, although it is stated by counsel that it has been so paid.

We do not care to decide whether or not Moores could be a good-faith purchaser under our recording laws.   It is claimed that he could not, for two reasons:   *First*, because his deeds limited his title, as heretofore stated; and, *second*, because under the authority of *Peters v. Cartier*, 80 Mich. 129, the grantee in a quitclaim deed cannot be a good-faith purchaser under our recording laws.   It is not necessary to determine these questions.   The defendant in possession, and who now claims the whole title to this land under warranty deeds, is a good-faith purchaser, and we believe that Moores and Jones & Porter supposed, when they acquired Mrs. Wilder's title, and when they sold to the H. Witbeck Company, that they owned the full legal and equitable title to these lands, barring the tax titles, which they proposed to litigate with Culbertson, Jr.

The claim of the complainant, as was said by the circuit judge, is a stale one.   Church acquired his interest in 1865.   He made no more use of his assignment for 20 years than if it had been blank paper.   The complainant in this case appears to be the legatee of his father's tax-title litigation for this land.   His father purchased this Church interest for him, presumably to help out his fight for the lands in case the tax titles failed. His father at that time knew of Moores' purchase, and

of the deeds by him and Jones & Porter to the H. Witbeck Company, which were on record two years before he bought from Church. He knew that this company had paid a large sum for this land in good faith, and his equities are not to be considered when compared with its equities. The father's knowledge must be considered, under the facts in this record, as the son's knowledge, and the son's equities as the equities of his father; no more nor less.

It would be inequitable in the extreme to grant the prayer of the bill as against the H. Witbeck Company; and no relief, if any could be had, seems to be asked against the other defendants.

The decree of the court below is affirmed, with costs.

LONG and GRANT, JJ., concurred with MORSE, C. J.

MONTGOMERY, J. The facts are sufficiently stated in the opinion of the Chief Justice. It is unnecessary to determine whether Jones & Porter and Moores had actual notice that Wilder had parted with his title, or sufficient notice of that fact to put them upon inquiry. The first conveyance executed by Mrs. Wilder was dated April 11, 1881, and consisted of an assignment of—

"All the right, title, and interest of Edward C. Wilder, deceased, in and to a tract of land in the county of Marquette, State of Michigan, acquired by virtue of an assignment of an interest in said lands made by William A. Pratt, January 30, 1857, and recorded in Liber one, of M. R., page 95, in Marquette county, Michigan."

This was executed by her as executrix of her husband's estate. The second conveyance was a quitclaim deed as executrix of such estate, dated May 17, 1881, in which she quitclaimed "all her right, title, and interest" in certain pieces of land, specifically describing them; and afterwards, December 8, 1881, she conveyed by quitclaim deed the same lands, specifically describing them, not

limiting the, deed to her right, title, and interest, or that of her husband, but conveying the lands absolutely, and without qualification.    This last conveyance was made upon no new consideration, so that the question presented is whether, under the previous conveyances, which were limited to her right, title, and interest, the grantees could occupy the position of *bona fide* purchasers. We think they could not.    *Eaton v. Trowbridge,* 38 Mich. 460; *De Veaux v. Fosbender,* 57 Id. 579; *Lumber Co. v. Hancock,* 70 Tex. 312 (7 S. W. Rep. 724).    In *Eaton v. Trowbridge* the deed conveyed " the now remaining interest" of Hastings in the Mullett farm.    It was said by the Court that,—

" Where a deed describes land by metes and bounds or otherwise, and purports to convey it, the grantee, if a purchaser for value without actual or constructive notice of previous conveyances, is entitled to claim what is described; but when one receives a conveyance of a 'remaining' interest, the description itself limits the operative words to the interest remaining unconveyed. The grantee purchases nothing further, and the grantor assumes to convey nothing more.    The deed, under the recording laws, defeats no prior unrecorded conveyances, because it is not a second conveyance of anything previously conveyed.    Both deeds may and do well stand together."

In *De Veaux v. Fosbender, supra,* it was held that a grantee claiming under a quitclaim deed, which purported to convey all the right, title, and interest of the grantor, could not occupy the position of a *bona fide* purchaser, or acquire any interest beyond that which actually remained in the grantor.

The deeds of Moores and of Jones & Porter to the H. Witbeck Company were warranty deeds.    This company took without notice of any claim against the lands by Church or any other person, and must be held to be a good-faith purchaser, and is entitled to protection as such.

The conveyances to the H. Witbeck Company included

the Tregent interest of 1,000 acres, as well as the land now in controversy. The full purchase price was $38,-000, and $13,000 of this sum remained unpaid at the time this bill was filed. While the defendant company is entitled to protection to the extent of the payment made before notice, it cannot claim protection for payments made after the filing of the present bill. *Palmer v. Williams,* 24 Mich. 328; *Blanchard v. Tyler,* 12 Id. 339; *Dixon v. Hill,* 5 1d. 404; *Kohl v. Lynn,* 34 Id. 360. If it were possible to apportion the interest so as to preserve the lands to complainant, we think the decree should be in that form; but, as the defendant company purchased the lands for the lumber, and prior to the filing of the bill commenced operations upon them, it would necessarily involve an accounting of its entire business before the court could decree a partition of the lands, and set off the same to complainant. No injustice, therefore, will be done to the complainant by a decree which shall provide that he recover from the defendant such proportion of the full purchase price of $38,000 as the value of the 758.33 acres bear to the whole value of the lands covered by the conveyances to it, and a decree should be entered in this form.

It is insisted that, as the transfer to Church was of 758.33 acres, undivided, in a tract of 14,000 acres, and as the interest of Wilder was at the time 758.33 acres, there was such a misdescription that no title passed. The intention of the parties is, however, perfectly clear to convey the remaining interest which Wilder had in this 14,000-acre tract; and, as all the facts are set out and appear in the bill, there is no reason why a court of equity should refuse to carry into effect the very evident intent of the parties.

McGRATH, J., concurred with MONTGOMERY, J.