# APRIL TERM, 1898.

## MURRAY v. RUGG.

1. EVIDENCE—INSTRUCTIONS.

It is error for the court to exclude testimony tending to show that a trust mortgage purporting to be executed by a corporation was not authorized by the board of directors, and afterwards leave it to the jury to determine whether it was authorized or not.

2. ESTOPPEL—MORTGAGES—DEFECTIVE EXECUTION.

The fact that the holder of an indorsed note of a corporation had some correspondence and conversation with the indorsers, advising them to take security for their claims, and thereby protect his interests as well as their own, and that, after what purported to be a trust mortgage for the benefit of all the creditors had been given to one of the indorsers, he wrote the latter with reference to his management of the business, will not estop him from attaching the property under a claim that the mortgage was never authorized by the directors of the corporation, and that he had never assented thereto, where he acted in entire ignorance of the fact that the indorsers were insolvent, and had covered up their individual property, and of the fact that the mortgage was unauthorized.

Error to Kalkaska, Aldrich, J. Submitted November 6, 1897. Decided April 5, 1898.

Trover by James H. Murray against Rolando F. Rugg. From a judgment for plaintiff, defendant brings error. Reversed.

*C. L. Bailey* and *W. S. Mesick* (*Fitch R. Williams*, of counsel), for appellant.

*Pratt & Davis* and *Totten & Phelps*, for appellee.

LONG, J. On April 3, 1893, the Michigan Handle Company, a corporation organized under the laws of this

State, made a mortgage upon all its real and personal property to the plaintiff, as trustee, in trust to secure all its creditors. The trustee took possession soon after the giving of the mortgage. The Antrim County State Savings Bank was a creditor to the amount of $4,325, and was secured to that amount in the mortgage. On May 18, 1893, that bank sued out a writ of attachment, and the sheriff under that writ took into his possession all the personal property conveyed by this mortgage. It appears that the plaintiff, James H. Murray, and Wilbur W. Peck were indorsers on the notes given by the Michigan Handle Company to the bank, and that John H. Edmiston was the president and general manager of the company. These parties were all made defendants with the Michigan Handle Company in the attachment proceeding. That proceeding went to judgment, and the property was sold under an execution. This suit is in trover to recover from the defendant, the sheriff who seized the property, the value of the property taken on the attachment. On a trial before a jury the plaintiff had verdict and judgment for $7,025. A motion for new trial was made and overruled, and defendant brings error.

It is conceded that every debt secured by this mortgage was *bona fide*, and most of the creditors secured accepted under it at once. The bank is situated at Mancelona, Antrim county. The plaintiff resides at South Boardman, in the same county. The Michigan Handle Company is also situated at South Boardman.

The plaintiff testified that, some two or three days before the mortgage was given, he talked with Mr. Knickerbocker, president of the bank, about taking security for the indebtedness of the Michigan Handle Company to himself, as he and Mr. Peck were indorsers upon all the paper of the company to the bank, as well as indorsers upon other paper of the company to other parties; that on April 1st, and after this talk, he received a letter from Mr. Knickerbocker, advising the taking of the security. The letter is as follows:

" J. H. MURRAY, Esq.,

" *Dear Sir:* As per your request when I left you last night, will say I have given your business very careful thought; and, knowing something of the outside feeling about the financial condition of the Handle Company, my advice would be for you and Mr. Peck to file your claim. The suggestion he made to buy it out is the best one, but still you can't do that without giving notice, and holding a meeting of the shareholders, and the consent by ballot of two-thirds of them. So you see, if you wait to do that, it will require time, and allow others to undermine you. If you thought best, and wire me, I will come down on the 4 p. m. train, and bring Mr. Bailey, also the State laws, so you can see for yourself the condition of affairs.

" If I understand it correctly, which I think I do, by you and Mr. Peck taking that into your own charge now, and cutting up that timber, you can get nearly enough out of what is there, and sell the team and equipments, to save yourselves clear, and then, if you don't want any more of it, turn it back to him, and let him go on with the business. I think, if this scheme was carefully considered, you would all agree with me, and by so doing save yourself and us; otherwise you will both lose heavily, and you can't avoid it. I wish you would send me a statement of the indebtedness of the firm, and the amount you have indorsed with him at other places than here, and the amount of judgments he has confessed, and claims upon which suit has been begun. It seems there has been an inclination to keep these things from us, and we feel that we are entitled to know the facts just as they are, without any hesitancy on the part of any one. I feel that, as you said last night, we are secured by your indorsements. Still, if we know your interests are secure, ours is just that much more secure. I trust you will wake up to a realization of the condition, and not subject yourself to such robbery any longer. Trusting to hear from you by return mail the full facts, I am,

" Yours truly,
" H. KNICKERBOCKER."

The plaintiff testified further that this letter referred to the making of a mortgage, and that the property to be taken into the possession of himself and Mr. Peck, and run by them, was the property of the Michigan Handle Company; that Knickerbocker said that they ought to be

protected for their own interest, and for the interest of the bank and all others; that they had explained to him the indebtedness to others, as they had indorsed paper to other parties for the Handle Company in the various amounts mentioned in the mortgage; that is: The Traverse City State Bank, $1,810; A. F. Young, $990; Old National Bank of Grand Rapids, $650; John De Vries, $610; H. M. Keys, $390; Darragh Bros., $300; A. A. Bleazby, $200; W. W. Peck, $458.59; Peck & Murray, $647.86; that there was also due to different parties from the Michigan Handle Company some $2,500, indorsed by Mr. Murray. The plaintiff further testified that, after the mortgage was executed, he was at Mancelona, and told Knickerbocker that it was on file, and that all the parties were secured; that it was then talked that himself and Peck should take the property, and that the bank should help run the mill; that afterwards, and on April 15th, he received a letter from Mr. Knickerbocker, as follows:

"PECK & MURRAY,

"*Gentlemen:* I have been unable to get our committee together, owing to some being absent, but I will say that those I have seen think that we ought to have 10 per cent. on the whole amount. But, through my urgent request to help you people out, they have decided to make 8 per cent. rates on $2,500, and 10 per cent. on sums above that amount.

"Trusting this will meet your approval, I am,

"Very truly yours,

"H. KNICKERBOCKER.

"P. S. Please let me know what your decisions are."

Plaintiff further testified that this letter was received after he had taken possession of the property as trustee, and had reference to himself and Peck taking hold of the business and running it; that they operated the property about a week, when the attachment was served on May 18, 1893; that in the meantime a meeting of the creditors had been called, at which meeting the Antrim County State Savings Bank was represented by its attorney; that the purpose of taking hold of the business with Mr. Peck was to pay the claims of the creditors.

It appears that, soon after this mortgage was given, Mr. Murray and Mr. Peck also gave chattel mortgages on their individual property to secure their creditors, and at the time of the trial it was admitted that Mr. Murray was insolvent.

On the part of the defendant, it was contended, and testimony was introduced to show the fact, that, a few days before this mortgage was given, Mr. Knickerbocker went to South Boardman, and there had a talk with Mr. Edmiston and Mr. Murray about securing the bank for the indebtedness due it from the Michigan Handle Company; that at this time Mr. Knickerbocker knew nothing of the indebtedness of the Handle Company, except that to the bank, and $400 or $500 outside of that; that at this time an arrangement was made with the Handle Company, through Mr. Edmiston, that a mortgage should be given tō the bank to secure it and the indorsers of the notes; that, when the arrangement was to be carried out, Mr. Knickerbocker was to be notified, and bring his own attorney down there to draw the papers; that this arrangement was not carried out, but he learned a day or two later that the mortgage to Murray as trustee had been executed; that he never accepted the terms of this mortgage. His explanation of the letter of April 1st is that while he was in South Boardman, a few days before, he had his suspicions aroused; that while there he heard that the company had been sued and had confessed judgment, and he wanted to know what it meant; and that the letter was not written to have any indebtedness included in the mortgage, except that of the bank. Mr. Knickerbocker further testified that, at the time the letter of April 15th was written, he did not know that Murray and Peck had executed mortgages upon their stocks, or that they were insolvent; that, a day or two before that letter was written, Murray and Peck came to him, and wanted to run the plant, and put in $200 on it, in improvements, if their indebtedness could be reduced that amount; that it was in response to that request that the letter

was written; that he did not understand by that that he was accepting the terms of the mortgage; and that he told Murray and Peck in that talk that he would not accept the terms of the mortgage. He further testified that: "My idea was that it would be better for Murray and Peck to take charge of it, and go on with the business, if they were better financiers than Edmiston; and I thought they were." He further testified that under this arrangement he expected to look to the parties for the payment to the bank. He denied that the bank had ever accepted the terms of the mortgage, but affirmed that, when the matter was submitted to it, the bank absolutely refused to recognize the mortgage, and refused to make any claim under it, and that the board of directors of the bank, by a unanimous vote, directed the commencement of the attachment proceedings.

It does not appear that Mr. Knickerbocker, by any affirmative act, accepted the terms of the mortgage. All that can be said of the testimony is that, when he found that the mortgage had been given, he sent the attorney of the bank to look it up, and, on ascertaining the true state of facts, reported them to the bank, and the bank refused to accept the terms of the mortgage, and made no claim under it.

After the plaintiff's case was closed, the defendant sought to show that the execution of the mortgage was never authorized by a majority of the directors or stockholders of the corporation, and that it was made with the fraudulent purpose of putting the property into the hands of Mr. Murray, who was insolvent at the time. The court refused to receive this testimony. The court charged the jury that, if they found that there was a meeting of the directors of the corporation held for the purpose of authorizing the trust mortgage, yet if the legal directors were not all there, and had not all been notified of such meeting, and reasonable time given in which to let the absent ones reach the meeting, then any action taken at the meeting was invalid; that, if they found that the mortgage was executed

by the president and secretary, their power must be derived from a resolution of the board of directors; and that, if these officers were not so authorized, the mortgage was not authorized, and plaintiff must fail, "unless the jury find that the mortgagee accepted the trust in good faith, and the same was treated by the Handle Company as a valid instrument, and the Antrim County State Savings Bank accepted the terms of said mortgage by its authorized agents." It therefore appears that the court, after ruling out the testimony of the defendant to show that the trust mortgage was not authorized, left the question to the jury to determine whether it was so authorized. The plaintiff's title to the property was in issue. If the mortgage was never authorized by the board of directors, it conveyed no title to the plaintiff. The court very properly so stated to the jury, but, in ruling out the testimony offered to show that it was not authorized, the court was in error.

The court was also in error in submitting to the jury the question of the acceptance of the terms of the mortgage by the bank. It appears conclusively that whatever was done by Mr. Knickerbocker or the bank in reference to that mortgage was in entire ignorance of the insolvency of Murray and Peck, and in ignorance of the fact that the mortgage was never authorized by the board of directors. With those facts ascertained, the bank would not be estopped from making claim under its attachment. The first letter from Mr. Knickerbocker to plaintiff was written before the mortgage was made. When the letter of April 15th was written, Mr. Knickerbocker knew nothing of the insolvency of Murray, though it appears that, 11 days prior to that, Murray and Peck both had conveyed all their property for the benefit of their individual creditors, and Murray had assigned his interest in this very trust mortgage. Neither did Knickerbocker know at this time that the mortgage was not authorized by the board of directors. There can be no estoppel unless a party is misled to his prejudice by the one against whom it is

set up, and does material acts relying upon conduct well calculated to mislead him. *Palmer* v. *Williams*, 24 Mich. 328; *De Mill* v. *Moffat*, 49 Mich. 125. We find nothing in this record which should estop the bank from showing that the mortgage was not authorized.

The judgment below must be reversed, and a new trial ordered.

The other Justices concurred.