BOLLSTROM *v.* DUPLEX POWER CAR CO.

1. CORPORATIONS—STOCK AND STOCKHOLDERS—FRAUD AND DECEIT.
Plaintiff's claim that he was induced to surrender to the corporation certain shares of its stock held by him by reason of the false and fraudulent representations of defendant stockholders, *held,* not sustained by the record.

2. SAME—SALE OF STOCK—EQUITABLE OWNER ENTITLED TO MAINTAIN SUIT FOR FRAUD IN SALE.
In equitable proceedings against the secretary of a corporation and certain of its stockholders to recover the difference in value of shares of stock between the amount paid by defendants and the true value, charging that defendant secretary misrepresented the true value, where it appears that plaintiff had always been treated on the books of the corporation as the owner of the stock, and the

On liability of officer of corporation for fraudulent representation which induced another member to sell his stock, see note in 1 L. R. A. (N. S.) 258.

secretary had so reported a short time before, although plaintiff had been in the habit of transferring same from time to time to persons to whom he was indebted, *held*, that plaintiff was the equitable owner of the stock and entitled to maintain this suit although he was present when the sale of the stock was made and recognized another, to whom he had transferred it as security, as the owner.

3. SAME—SALE OF STOCK—ESTOPPEL—FRAUD AND DECEIT.

Although plaintiff would be estopped from disaffirming the sale of said stock, he is entitled to maintain this suit to recover for the fraud of defendant secretary in misrepresenting its value.

4. SAME—FRAUD AND DECEIT—EVIDENCE—PROOF.

Testimony reviewed, and *held*, to conclusively establish the fact that at the time of the sale of said stock defendant secretary knew of the completion of a deal whereby the assets of the corporation were to be taken over by another corporation and its stock was to be taken at double its par value in cash or stock of the new corporation.

5. SAME—FRAUD AND DECEIT—WITHHOLDING SECRET INFORMATION —FALSE REPRESENTATIONS.

Representations by defendant to plaintiff, upon which the latter relied, that he was getting a fair value for his stock, and that he was making a good bargain in selling it at par, although defendant possessed secret information at the time that it was worth double the par value, *held*, to conclusively show that defendant secured said stock by fraud and deception, and that plaintiff was damaged thereby.

6. SAME—STOCK AND STOCKHOLDERS—SALE OF STOCK.

Plaintiff, by this action having affirmed the sale of his stock, would not be entitled to share in the benefits derived by the stockholders at the time of the sale of its assets to another corporation under a decree of the court in another suit.

Appeal from Eaton; Smith (Clement), J. Submitted November 5, 1919. (Docket No. 98.) Decided December 22, 1919.

Bill by Maurice Bollstrom against the Duplex Power Car Company and others for an accounting. From a

decree dismissing the bill, plaintiff appeals. Reversed, and decree entered.

*Elmer N. Peters* (*Frank A. Dean* and *Claude J. Marshall,* of counsel), for plaintiff.

*Rosslyn L. Sowers, Colgrove & Potter* and *Burritt Hamilton,* for defendants.

SHARPE, J.   The Duplex Power Car Company was organized in 1909, and exercised its corporate powers until its assets were sold to the Duplex Truck Company on November 20, 1916. There has been much litigation relative to its affairs. The facts in this case will be better understood by a reference to the cases which have been considered by this court: *Hill* v. *Town,* 172 Mich. 508 (42 L. R. A. [N. S.] 799) ; *Town* v. *Duplex Power Car Co.,* 172 Mich. 519; *Toles* v. *Duplex Power Car Co.,* 202 Mich. 224; and *Garber* v. *Town, ante,* 1.

The plaintiff was one of the patentees of the device for a 4-wheel drive which distinguishes the truck that the company manufactured; 2,500 shares of stock were allotted to him for his interest in the patent. Previous to February 21, 1913, he had by transfer reduced his holding to 1,743 shares. A suit had been brought by some Chicago parties to whom stock had been sold and the plaintiff made a party thereto. This had been settled by the defendant Town, who was then a stockholder in the same corporation. At a stockholders' meeting, held on April 21, 1913, at which plaintiff was present, the record shows the following:

"Mr. Town as attorney in fact for the stockholders reported that he had effected a settlement with the defendants whereby upon the payment by him of the sum of fourteen thousand ($14,000.00) dollars they had assigned to him for the benefit of the complainant stockholders 6,885 shares of stock, together with the

mortgage held by Farlin H. Ball, as trustee, and all claims they might have against the company.

"Mr. Town reported that the expenses incurred in consequence of litigation, receivership and maintenance would approximate about ten thousand ($10,000.00) dollars, and that while there was sufficient assets, if properly handled, to take care of this indebtedness, yet in his opinion the $10,000.00 expenses should be taken care of by the sale of stock to those who had pledged to pay their *pro rata* of this expense.

"Moved by R. A. Garber, supported by Brown, that complainant stockholders be asked to subscribe as much more stock as they now held, to liquidate these expenses, for which a double amount to that subscribed be issued them.

"Carried unanimously.

"Mr. M. Bollstrom stated that it would be impossible for him to pay for his quota of stock, and after some discussion he offered to shrink his stock back to the complainant stockholders, to pay his *pro rata* of litigation and maintenance expenses.

"On motion duly made his proposition was unanimously accepted."

Agreeably to such proceedings, plaintiff surrendered 582 shares of his stock to the corporation, and the other stockholders took additional stock as provided for in the minutes of such meeting. It is now the claim of the plaintiff that he was induced to make such surrender by the false and fraudulent representations of the defendant stockholders and that this transfer on his part should be set aside. We consider this claim at this time as it is entirely disconnected with the other questions presented. In disposing of it, the trial judge said·

"Without going into this claim with specific exactness, but passing on, it is only necessary to state that it is the judgment of the court that the plaintiff has entirely failed to establish any fraud practiced upon him as to that settlement, or any wrong done to him in that matter. He was not asked to do more than he ought as matters then stood, and he did not do more

than he ought. Relief under this claim as asked for by plaintiff cannot and should not be granted."

We have carefully read the testimony on which plaintiff relies. The value of the stock at that time was problematical, and, as plaintiff attended many meetings thereafter, being for a part of the time a director, and in no way questioned the good faith of the transaction until he filed the bill of complaint in this cause on March 21, 1917, we are content with the conclusion reached by the trial judge relative thereto. *Lewless v. Railway Co.*, 65 Mich. 292, 303.

The stock involved in the litigation referred to (6,-885 shares) was transferred to the defendant Town as trustee and for some time thereafter voted by him as such. At the meeting held on April 21st, a board of directors was elected which included the defendant Town, and at a directors' meeting, held on the same day, he was elected president of the corporation. It appears from the allegations in the bill of complaint, supported by the proofs, that thereafter Mr. Town was not only the executive head of the corporation but practically in charge and control of all its affairs.

In the summer of 1916, it became apparent that additional capital was needed to make the business a success. In September and October, an effort was made to interest certain Detroit and New York parties.

In October, 1916, Town began negotiations with Louis Rowley, of Lansing, for the sale of the property of the corporation to certain parties living in that city. This deal was practically consummated on or about the 24th day of that month, though not reduced to writing until the 30th. On that day, Mr. Town entered into a written contract with Harry M. Lee and eight other Lansing citizens, who will hereafter be spoken of as the Lansing syndicate, for the transfer to such syndicate, when formally organized into a

corporation, of "all the property, franchises, rights, privileges, assets and good will of the Duplex Power Car Company of Charlotte, Michigan, and all its patents or rights in patents by license or otherwise."

Town represented that there were outstanding 15,-500 shares of stock in the car company, of a par value of $10 each, and the Lansing syndicate agreed to pay to the holders of such stock two shares of stock in the corporation to be formed by them for each share so held in the car company, or, at their option, $20 per share for such stock, being double the par value thereof, and to assume and pay all obligations and indebtedness of the car company. At the same time, the following agreement was entered into and signed by Mr. Town and all of the members of the Lansing syndicate:

"This agreement, made this 30th day of October, 1916, between Frank P. Town of Charlotte, Michigan, party of the first part, and Harry M. Lee, G. W. Hewitt, Harry F. Harper, Elgin Mifflin, W. H. Porter, E. S. Porter, J. Edward Roe, James H. Robinson and H. E. Bradner, all of Lansing, Michigan, parties of the second part, witnesseth as follows:

"Whereas, the parties of the second part purpose and intend to organize a corporation for the manufacture and sale of motor power trucks, and it is their purpose and desire when said company is organized, to purchase all the property, franchises, rights, privileges, assets and good will of the Duplex Power Car Company of Charlotte, Michigan, and all its patents or rights in patents by license or otherwise; and

"Whereas, the party of the first part agrees to acquire possession and control of not less than three-fourths of the outstanding stock of the said Duplex Power Car Company, and that when he so acquires the same, he shall deposit the same with some bank in Charlotte agreeable to second parties with proxies if so desired. First party also agrees that when he acquires such stock he shall use the same and its voting power either personally or by proper proxies to cause and procure a sale and transfer of all the prop-

erty, franchises, patents, rights in patents, as aforesaid, business, good will, rights and privileges of the said Duplex Power Car Company to a corporation to be hereafter organized by the parties of the second part. Said new corporation to assume and pay all the debts and obligations of whatever nature of said Duplex Power Car Company.

"It is agreed by second parties that in consideration and on condition that the said Town shall acquire said stock of said company aforesaid, and shall use or cause the same to be used to procure or secure the sale and transfer of all of the property, rights and assets of the said Power Company as aforesaid, to said corporation to be hereafter organized by second parties, that said second parties will pay to the said first party at the option of said first party $75,000 in cash or an equal amount of the par value of the stock of said new corporation to be organized by second parties. Said money to be paid or said stock delivered within ten days after said new corporation is organized and said transfer made to it by said Duplex Power Car Company.

"It is agreed that this agreement shall not be binding upon any of the parties hereto until all of the parties named herein have signed the same."

Both of these agreements were afterwards fully performed according to their terms. The $75,000 provided for in the latter was paid to Mr. Town.

The defendant Murray had been a director and secretary of the car company since February, 1915. On October 27, 1916, Dr. George Toles, of Charlotte, went to Murray for the purpose of purchasing some stock in the corporation. He gave him his check for $100 as down payment on 1,000 shares. Within half an hour thereafter, Murray informed Town by telephone and Town said to him that there was a deal on and no stock for sale. There was subsequently some personal talk between them that afternoon.

A certificate had been issued to plaintiff for his 1,161 shares on August 6, 1913. This he had assigned

as security from time to time, but it had not been sent in for transfer until in October, 1915, when Mrs. E. E. Thompson, plaintiff's sister, so sent it to the defendant Murray. No such transfer was made. On September 11, 1916, she wrote Mr. Murray asking for the new certificate. The transfer was not made, and on October 21st she mailed to the corporation a written assignment of the stock to H. G. Wurst, a brother-in-law of plaintiff, and asked that the certificate be mailed to him. Plaintiff claims that he had theretofore on several occasions asked that his certificate be canceled and several smaller ones issued to him in its stead. This was not done. The original certificate, with the assignment of Mrs. Thompson indorsed thereon, was in defendant Murray's hands as secretary of the company on October 27, 1916. Plaintiff had on several occasions stated, and had in fact testified in certain legal proceedings, that he was not the owner of this stock. Differences had existed between him and Town, and perhaps some of the other directors. Town had theretofore secured a personal judgment against plaintiff.

On the morning of October 28, 1916, Murray went to Battle Creek to get in touch with plaintiff. His purpose was to secure an option on the 1,161 shares of stock. Not finding plaintiff on that day, he went there again on the 29th, and again on the 31st, at which time he met plaintiff. He inquired about Wurst, whom he knew to be the brother-in-law of plaintiff, and plaintiff brought them together at his home. After some negotiations, an attorney was employed by Murray and an assignment made by Wurst to Murray in which Wurst warranted that he was then the owner of the stock. An option was prepared and signed by Wurst, giving Murray the right to purchase the 1,161 shares for $10 per share at any time within 15 days thereafter. Fifty dollars advance payment was made

thereon. The plaintiff participated in the negotiations leading up to the assignment and option, and was present when they were signed. Wurst insisted on his being satisfied with the deal as finally made. The option and assignment were left in a bank at Battle Creek and were taken up by Murray within the 15 days. The certificate was canceled and a new certificate issued therefor to Murray on November 18, 1916. On the same day, this certificate was canceled and one issued to each of the defendant directors, except Town, for 50 shares, and one to each of two employees of the company for 25 shares each. These Murray testified were a gift on his part, no consideration having passed to him therefor. For the remaining shares, a new certificate was issued to Murray. All of these certificates were turned in to the truck company.

Plaintiff in this suit seeks to recover the difference between the amount paid under the option and the value of these shares as turned in to the truck company. He claims that he was then the equitable owner of the stock and that Murray secured it in fraud of his rights as a stockholder.

The defendants filed a joint answer. They deny the right of plaintiff to maintain this suit for the reason that he had parted with his title to the stock. They deny that Murray had any knowledge of the deal with the Lansing syndicate, or in any way deceived plaintiff or Wurst in the purchase he made, and allege this stock was purchased because plaintiff was a disturbing factor in the affairs of the corporation, and claim that the option and purchase thereunder were made in the usual way, without any intent to gain an advantage over either plaintiff or Wurst. They admit that defendant Town assisted Murray in securing the money to pay for this stock by indorsing his note, and also admit that Murray distributed the shares thus purchased by him as before stated.

Further facts will be stated in the discussion of the questions presented.

The trial court rendered a decree dismissing the bill, holding, as to this claim, that the deal by which Murray purchased the stock was a fair one and that as plaintiff had parted with his stock he was not a stockholder and had no standing in court in such a proceeding. From the decree rendered, plaintiff appeals.

There can be no question under the proofs but that plaintiff has always been the equitable owner of this stock. He made transfers to persons to whom he was indebted as security, and, at the time Murray procured the option on it, Wurst held it as security for an indebtedness of $250. The testimony of plaintiff as given on this trial and in a proceeding before Judge North at Battle Creek shows him to be an eccentric individual, very talkative, and not so careful in his statements as he might well have been. Notwithstanding the assignments of which the officers of the company had theretofore had notice, and of the fact that the certificate of stock assigned to E. E. Thompson was in the hands of the secretary at the time, the annual report, made as of August 31, 1916, and sworn to by the defendant Murray as secretary on October 30, 1916, listed this stock as belonging to plaintiff. The testimony (hereafter quoted) of both plaintiff and Wurst as to the statements made by Murray during the negotiation for the option clearly indicate that Murray then knew that the stock was the property of the plaintiff. We do not attach much importance to the expressions of warranty in Wurst's assignment to Murray. Its purpose was evidently to secure a good and indefeasible title to the stock.

As before stated, plaintiff was unquestionably the equitable owner of the 1,161 shares, subject only to the lien of Wurst thereon for $250. He permitted

Wurst to represent himself to be the owner thereof and to sell it to Murray. Were he now seeking to attack the validity of such transfer, he would clearly be estopped from doing so. He is, however, affirming the sale, not seeking to set it aside. His claim is that as he was then the owner of the stock, subject to Wurst's lien thereon, Wurst acted as his agent in transferring it and he ratified such action. After the transfer was completed, he claims to have discovered that he had been defrauded by the action of Murray in securing the stock at one-half its value. He seeks to recover for this fraud, not by disaffirming the contract but in reliance on it. This, either he or Wurst clearly had a right to do. As is said in 20 Cyc. at page 86:

"An action of deceit to recover damages for fraud inducing the making of a contract is not based upon the contract but upon the tort. The action proceeds upon the theory of an affirmance of the contract alleged to have been fraudulently procured."

While this right of action is included in equitable causes for which plaintiff seeks to recover in this suit, the prayer as to this is that the defendants do pay to the plaintiff the difference between the amount paid by Murray and its value at the time of its purchase. Wurst received the amount due him out of the payment made by Murray on the option and had no further interest in the stock or in the transaction. Counsel for defendants say:

"No matter from what angle plaintiff's conduct is viewed, he is clearly estopped from asserting title or ownership to the stock sold to Mr. Murray."

The argument of counsel and authorities cited on this question are largely in support of the claim as stated. As has been observed, plaintiff is not claiming title to the stock. He affirms the sale and admits that title passed to Murray. But he insists that fraud

was practiced by Murray on Wurst and himself in securing such title, and, as a result of such fraud, he, and not Wurst, has been damaged. To such a claim, the doctrine of estoppel has no application. The gist of such a defense is thus stated:

"There can be no estoppel unless a party is misled to his prejudice by the one against whom it is set up, and does material acts relying upon conduct well calculated to mislead him." *Murray* v. *Rugg,* 116 Mich. 519.

"It is the well-settled rule in regard to estoppels *in pais* that the conduct complained of must have induced another to act to his disadvantage, and that his situation in consequence thereof has changed." *Gooding* v. *Underwood,* 89 Mich. 187.

We fail to see, nor do counsel point out, in what way Murray has been prejudiced by the failure of plaintiff to assert his ownership of the stock at the time the option was given by Wurst. That Bollstrom is the plaintiff in this suit in no way enhances the damages or affects any defense defendants might set up. We therefore conclude that plaintiff was entitled to bring this action.

Had Murray knowledge of the fact that Town had closed the deal with the Lansing syndicate at the time he secured the option from Wurst? Both he and Town testified that he had not. Plaintiff claims that the circumstances surrounding the transaction lead to the conclusion that he had. We have read the record with care. There is no positive proof to sustain plaintiff's claim, but it is the duty of the court to weigh the testimony and draw a fair and reasonable inference from what was done and said in reference to it.

After Town secured the assignment of the stock from the Chicago parties to himself as trustee in 1913, he voted it at all meetings of the stockholders and thereby practically controlled the election of the board of directors. While president, he exercised not only

the duties of that office but of all the others as well. The money of the corporation was kept in his name in the bank. The negotiations with the New York and Detroit parties in September and October, 1916, were carried on by him alone, but Murray admits that he knew about it and saw the correspondence. The relations between Town and Murray were apparently very cordial and confidential, and, while Town might have believed it best to conceal from Murray his negotiations with Mr. Rowley, there was no reason for concealment after the deal was concluded between the Lansing syndicate and himself. He closed this deal with Rowley on October 27th, though it was not reduced to writing until the 30th. On the 27th, Murray telephoned to him about the Toles purchase and was told that there was a deal on and no stock for sale. Murray could not well have understood this to refer to the deals with the Detroit or New York parties, as he already knew about them. Soon after, he saw Town and talked with him. Both deny that anything was said about the deal with the Lansing syndicate, though it was in effect closed at that time. The next day Murray went to Battle Creek to secure plaintiff's stock. Not having seen him, he went again on the 29th. He states as a reason for not going on the 30th that that was Sunday. The calendar shows he was mistaken in this, but it is significant that on that day, the 30th, the contract between Town and the Lansing syndicate was executed at Charlotte. On the next day Murray drove to Battle Creek in his car, reaching there about 8 o'clock in the morning. He admits that before leaving Charlotte he spoke to Town about helping him to get the money to buy the stock. While the deal for plaintiff's stock was pending in Battle Creek, Murray called up Town and read a paper to him. They both claim that it was not the option but the assignment of the stock certificate. They both admit that Town told

Murray about the Lansing deal on the next day, November 1st. The question naturally occurs, If Town felt at liberty to tell about it on November 1st why would he not have informed Murray about it on the 31st when he knew Murray was trying to buy plaintiff's stock? On October 31, 1916, the day after the agreement with the Lansing syndicate was made, Town wrote to K. F. Ranger, who was a stockholder in the company, the following letter:

"There are some changes being contemplated in the Duplex and no doubt in taking in more capital, our interests will be somewhat influenced by the new additional capital and it is proposed that we make settlement most satisfactory to ourselves in the way of cash for our stock, or stock in the new organization which no doubt will be the result of the change.

"If you will inform me what you desire for your stock by return mail or if you desire to take stock in the new organization please so state, and you will greatly oblige. Please inform me at your earliest convenience as we can get a good price for our stock at this time no doubt and by stating what you desire for yours, we can then govern ourselves accordingly."

The money to pay for plaintiff's stock was secured by a loan, for which Town indorsed Murray's note to the bank. When Murray got the stock, he issued new certificates therefor, as before stated, and out of the proceeds he paid the judgment Town had theretofore secured against plaintiff.

Under the rule as to the weight to be given to circumstantial evidence, can these facts, all of which are admitted by Murray or are established beyond question, be true and it be said that he had no such knowledge? We cannot believe that any jury would so conclude, nor can we do so. We feel constrained to hold that at the time Murray secured the option from Wurst he knew all about the contract which Town had entered into relative to the sale of the assets of the company to the Lansing syndicate.

Did Murray commit a fraud upon plaintiff by not informing either him or Wurst about it? It is the claim of the defendants that though Murray was an officer of the corporation and stood in a fiduciary relation to it, he occupied no such relation to the individual stockholders and was under no obligation to advise the plaintiff as to any information he possessed relative to the value of the stock. Attention is called to the language of Justice GRANT in *Walsh* v. *Goulden,* 130 Mich. 531, at page 539:

"Directors, of course, stand in a fiduciary relation to the corporation itself. They do not stand in that relation, however, when dealing with other stockholders for the purchase or sale of stock. In the purchase and sale of stock between stockholders there must be some actual misrepresentation in order to constitute fraud. Mere silence is not sufficient. The books of the corporation are open to all stockholders alike, and each may inform himself of the condition of the company."

Counsel also cite 2 Thompson on Corporations (2d Ed.), § 1419; 8 Thompson on Corporations (2d Ed.), § 1419; 2 Machen on Corporations, § 1637; 1 Cook on Corporations (7th Ed.), § 320.

The reason for the rule thus stated is clearly summarized in the closing part of the quotation:

"The books of the corporation are open to all stockholders alike, and each may inform himself of the condition of the company."

As applied to a going concern, whose records reveal the book value of the stock, and the good will and intangible assets of which are presumably as well known to one stockholder as another, there may be no hardship in so holding. But the proofs in this case present a different situation. The affairs of the corporation had not been prosperous for several years. Mr. Town testified that in 1913 one could not sell the

stock "for ten cents on the dollar." While the nego-
tiations at Battle Creek were pending, Wurst testified:

"A. On the way down to the bank I says, 'How is
business over there?' 'Why,' he says, 'It is pretty
good.' He says, 'It ain't as good as it ought to be,
or as good as it can be made.' He says, 'They don't
seem to just manage the thing right to make it go
successfully.'

"Q. Did he make any statement as to whom he was
purchasing this stock for?

"A. He says—that was at the time he wanted the
twenty-day option, he says, 'I have got a chance now
to get the money for Maurice. Maurice and me have
been pretty good friends, I always like Maurice well.
I have got a chance now to get this money for him.
A relative of mine from Ohio wants to take this stock
over.'

"Q. Did he say anything about the value of the
stock, whether that price he was paying was a fair
price—a good price?

"A. Yes, sir, that that was a good price. He says,
'It ain't every day that you can sell stock at par.' "

It is apparent that Bollstrom's suspicions were
aroused when Murray approached him to buy this
stock. His relations with Town had not been friendly,
and he knew that Town was the dominating power in
the board of directors. He testified as to his conver-
sation when he first met Murray on the 31st:

"He was waiting in his car on the street near our
home in the morning, the approximate time that I ex-
pected to go down town between seven and eight in
the morning. He hailed me. I did not play up to him
very strong. He says, 'I am not going to hurt you,
I am here to do you good. I am a friend of yours.
I have always been a friend of yours.' He asked me
about the stock and I did not give a direct answer.
I asked him what he wanted and he said he knew
where that stock could be disposed of, and I asked him
who wanted it. He said that didn't cut any figure
who wanted it, if I wanted to sell it. I said some-
thing about liking to deal with a person direct and
told him to let me know who wanted it, and I would

look into it, and he said that could not be done because he had to make a deal that day or not at all, the deal would be all off. He just had that little time. I asked him how that was, or words to that effect. He said it was some out of town people that nobody knew any way, saying it did not matter if I wanted to dispose of it who it was, and I said I was going to know. He said it was a relative in Ohio. I knew he had relatives there and asked if they had the money.  *  *  *  I asked how much they wanted to pay for the stock and he asked how much I would take. I said I would have to look into it and the conversation along that line went on. He suggested par and I expressed doubts because I did not get a clear explanation of what I wanted to find out. I expressed doubt whether I could get Mr. Wurst in that length of time. I was told it would be a very fine thing for me, again reiterating his friendship and I suggested they might put in writing what they would do and he said that could not be done because the deal had to be concluded that day or there would not be anything done. He said par might be paid, and I said I would see."

These statements were denied by Murray, but on cross-examination he testified:

"*A.* I told them I thought I was paying enough for it.

"*Q.* In other words you told this man there at that time that you were paying them what you considered to be a good price for that stock?

"*A.* Yes, sir.

"*Q.* A fair price, and all it was worth?

"*A.* Yes, sir, I did so consider it.

"*Q.* You told them that was your opinion, didn't you?

"*A.* Yes, sir."

He further testified:

"*Q.* Did you tell them a syllable about it?

"*A.* Yes, there was something said about a deal; Mr. Bollstrom asked about the deal, asked what was doing, I didn't know what to tell him. There wasn't anything to tell him.  *  *  *

"*Q.* He asked you a question and you didn't answer it?

"*A.* Yes, I answered it, there was not anything particular doing that I knew of."

And again:

"I don't recollect Bollstrom asking me in whose interest I was there. I did not tell him I had some people, relatives in Ohio, that would like to get this stock. My recollection there was no reference made at all to any one in Ohio that would like to buy this stock. I might have said something, but cannot remember, but don't think I said that."

Mr. Murray at this time was a director and secretary of the company in which plaintiff was, in equity, a stockholder. As such officer, he had information, not accessible to the stockholders generally from the records, that plaintiff's stock was worth double its par value. He did talk about it and assured plaintiff and Wurst that they were making a good bargain in selling, getting a fair value for their stock. While, under the authorities on which defendants' counsel rely, he might have remained silent and declined to advise with them about the value of the stock or the fairness of the deal, the statements which he did make were an inducement to them to sell the stock to him were false in fact, and known by him to be so, and must be held to have been relied on by plaintiff. Any less stringent rule would place it in the power of an officer of a corporation to take advantage of a condition known only to him, and of which the records would afford no information, by which the value of the stock had been greatly enhanced, and, by an assurance to the stockholder that the price offered was a fair one, secure to himself the shares of that stockholder at a price grossly inadequate, in view of the information possessed by him. We think the facts in this case bring it squarely within the rule laid down in *Strong* v. *Repide*, 213 U.

S. 419 (29 Sup. Ct. Rep. 521). In that case the president of a corporation purchased stock at much less than its par value as known to him and due to conditions unknown to the stockholders. The court said:

"If it were conceded, for the purpose of the argument, that the ordinary relations between directors and shareholders in a business corporation are not of such a fiduciary nature as to make it the duty of a director to disclose to a shareholder the general knowledge which he may possess regarding the value of the shares of the company before he purchases any from a shareholder, yet there are cases where, by reason of the special facts, such duty exists. The supreme courts of Kansas and of Georgia have held the relationship existed in the cases before those courts because of the special facts which took them out of the general rule, and that under those facts the director could not purchase from the shareholder his shares without informing him of the facts which affected their value."

After a review of the facts, the court concluded:

"If under all these facts he purchased the stock from the plaintiff, the law would indeed be impotent if the sale could not be set aside or the defendant cast in damages for his fraud."

Judge Peckham, who wrote the opinion, cites *Stewart* v. *Harris*, 69 Kan. 498 (77 Pac. 277, 66 L. R. A. 261, 2 Ann. Cas. 873); *Oliver* v. *Oliver*, 118 Ga. 362 (45 S. E. 232). These cases are very instructive on the general proposition here presented.

We cannot but conclude that Murray secured this stock by fraud and deception, and that plaintiff was damaged thereby. The amount of such damage was the difference between the sum Murray paid for the stock and its value at the time it was turned in to the Duplex Truck Company. The plaintiff is entitled to recover such amount from the defendant Murray.

The bill of complaint also contains in substance many of the allegations in the bill filed by Rolandus

A. Garber and others against Frank P. Town and the other individual defendants herein, praying for an accounting against Town and the other defendants as therein set forth. By this action the plaintiff has affirmed the sale of the 1,161 shares of stock to Murray. He is therefore not entitled to share in the benefits derived by the stockholders at the time of the sale to the truck company under the decree in that case.

The decree of the trial court dismissing the bill of complaint will be reversed and one entered in this court in conformity with this opinion. The plaintiff will recover costs of both courts against the defendant Murray.

BIRD, C. J., and MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.